UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

RICHARD A. DEMPSEY, Individually and on :
Behalf of All Others Similarly Situated,

               Plaintiff,

    vs.

DAVID P. VIEAU and DAVID J.
PRYSTASH,

              Defendants.

———————————————————— x

Civil Action No. 13-cv-6883

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Richard A. Dempsey ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by A123 Systems, Inc. ("A123" or the "Company"), as well as conference call transcripts, media and analyst reports, and other public records of the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the securities of A123 between February 28, 2011 and October 16, 2012, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against A123 and certain of its most senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. A123 sought protection under the federal bankruptcy statutes on or about October 16, 2012 and is not named as a defendant in this action.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as the stock of A123, which has since been declared bankrupt and had its assets sold and its stock delisted, was traded in this District during the Class Period on The NASDAQ Stock Market

("NASDAQ") and much of the alleged misconduct was transacted in and emanated from this District. A123's bankruptcy counsel is Latham & Watkins LLP in New York, New York and counsel to the Official Creditors' Committee in the A123 bankruptcy is Brown Rudnick LLP in New York, New York.

4.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Richard A. Dempsey, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased A123 common stock during the Class Period and has been damaged thereby.

6.      Non-party A123 was headquartered in Waltham, Massachusetts during the Class Period and designed, developed, manufactured, and sold advanced rechargeable lithium-ion batteries and battery systems. The Company's common stock was listed on the NASDAQ, an efficient market, throughout the Class Period, under the ticker symbol "AONE," and, as of October 1, 2012, the Company had approximately 305.7 million shares of common stock issued and outstanding. On October 16, 2012, A123 filed for protection under the bankruptcy laws; on January 28, 2013, Wanxiang America, Inc. ("Wanxiang America") purchased the preponderance of A123's assets out of bankruptcy; and on March 22, 2013, the Company changed its name from A123 Systems, Inc. to B456 Systems, Inc.

7.      Defendant David P. Vieau ("Vieau") served as Chief Executive Officer ("CEO"), President and a director of A123 during the Class Period.

8.      Defendant David J. Prystash ("Prystash") served as Chief Financial Officer ("CFO") of A123 from May 12, 2011 through the end of the Class Period.

- 2 -

9.    The parties referenced above in ¶¶7-8 are referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

10.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the securities of A123 during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

11.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, A123 common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by A123 and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

12.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

13.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

14.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- 3 -

(a)      whether the Exchange Act was violated by Defendants as alleged herein;

(b)      whether statements made by Defendants misrepresented material facts about the business, operations and management of A123; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

15.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

16.      In 1976, Congress passes the Electric and Hybrid Vehicle Research, Development, and Demonstration Act.  The law was intended to spur the development of new technologies including improved batteries, motors, and other hybrid-electric components.  In 1990, California passed a Zero Emission Vehicle Mandate, which required that two percent of the state's vehicles have no emissions by 1998 and ten percent by 2003.

17.      In 2001, Dr. Yet-Ming Chiang, Dr. Bart Riley, and Ric Fulop founded A123.  The Company's original product technology was based upon materials initially developed at the Massachusetts Institute of Technology ("MIT").  In November 2005, the Company announced a new, higher-power, faster-recharging lithium-ion battery system based on doped nanophosphate materials licensed from MIT.

18.      By July 2008, gas prices had reached record highs of more than $4 a gallon and, on the campaign trail in August 2008, then-presidential candidate Barack Obama said he would push to have one million plug-in hybrid and electric vehicles on America's roads by 2015.

19.      Upon election, President Obama made electric vehicles a centerpiece of his clean-energy policy, spending $5 billion on loans, grants and purchaser tax credits to support them during his first term in office.  The American Recovery and Reinvestment Act of 2009 allocated some $2 billion for development of electric vehicle batteries and related technologies.  The U.S. Department of Energy ("DOE") added another $400 million to fund building the infrastructure necessary to support plug-in electric vehicles.

20.      In June 2009, the DOE awarded $8 billion in loans to automakers Ford, Nissan, and Tesla Motors to support the development of fuel-efficient vehicles.  The automaker loans were the first distributions from a larger $25 billion fund created under the Energy Independence and Security Act of 2007.

21.      One of the investment goals of the Obama administration was to bring down the cost of rechargeable car batteries.  Plug-in cars sell at a premium over conventionally powered vehicles because of the cost of the batteries.  Without policy and financial incentives, the Obama administration knew automakers would stick to less fuel-efficient and more profitable vehicles using existing technology.

22.      In 2010, A123 received a $249 million grant from the DOE for building rechargeable auto battery production facilities.  Approximately $132 million of the DOE grant funds were used to build a 550 MWh Livonia, Michigan battery plant – the largest lithium ion battery manufacturing plant in North America – and a Romulus, Michigan plant.

23.      A123's largest customer was Anaheim, California-based Fisker Automotive, Inc. ("Fisker"), which also received hundreds of millions of dollars in DOE funding.  A123 was to be the supplier for Fisker's flagship vehicle, the Karma.  The Fisker Karma, initially slated to begin commercial roll-out in 2009, was one of the world's first production plug-in hybrid electric vehicles

and would sell for more than $100,000. As incentive to obtain the Fisker supply contract, in January 2010, A123 purchased $20.5 million of Fisker preferred stock, paying Fisker $13 million in cash and issuing 479,282 shares of A123 common stock valued at the time of transfer to Fisker at $7.5 million. Karma battery sales to Fisker would reportedly comprise 25% of A123's revenues during the Class Period. Because of delays in obtaining regulatory approval, the Karmas would not start rolling off the assembly line until July 2011.

24.     Meanwhile, however, unbeknownst to the investing public and known only by Fisker and A123 senior executives, by June 2010, only two months after Fisker's DOE own funding had been finalized, the DOE warned Fisker that its continued failure to achieve funding milestones threatened its ability to receive future funding from the DOE.

25.     By February, 2011, Fisker had defaulted on its DOE loan by failing meet the production milestone of commencing the commercial roll-out of the Karma.

26.     By June 2011, the DOE had halted funding disbursements to Fisker, citing delays in the Karma's commercial rollout. The Obama administration was by then smarting over having loaned Solyndra, LLC more than $500 million in September 2009, only to learn in January 2011 that Solyndra was on the brink of bankruptcy, and then being forced in February 2011 to provide another $75 million in financing to Solyndra just to keep that faltering company afloat for a short while longer.

27.     Though Fisker ultimately commenced production and delivery of Karmas in the US in July 2011, eventually making approximately 2500 Karmas, Fisker too had already run out of money by the fall of 2011 and was then refusing to accept further battery deliveries from A123.[1] As a result, by December 2011, A123 would lay-off 125 workers and would abandon the remaining

---

[1]     Of those 2,500 cars, 1,600 were purchased by consumers and another 338 were destroyed by Super Storm Sandy in November 2012 while parked at the Port of Newark, New Jersey.

$120 million of its own DOE grant.  Meanwhile, a DOE credit report dated December 12, 2011, listed the "recovery rate" on the Fisker funding at 50%, indicating the government did not anticipate recovering the entirety of its loan to Fisker.  The December 2011 credit report also noted Fisker's weakening credit rating, which declined from CCC+ to CCC due to its "deteriorating financial profile and/or persistent operational inefficiencies."  The credit report also stated that "DOE staff asked questions about the delays" in the Karma's launch "and received varied and incomplete explanations," which had led to the suspension of Fisker's DOE funding in June 2011.

28.     Fisker would halt production of the Karma altogether in the summer of 2012 in order to seek new investors.  A123 filed bankruptcy in October 2012.  By March 2013, Fisker would hire a law firm in anticipation of filing its own bankruptcy.  In April 2013, Fisker missed its first scheduled payment to the DOE and laid off 75% of its own workforce, retaining only a core group of 40 workers to negotiate with prospective investors.  Because Fisker – like Solyndra – had received more than $500 million in DOE grants[2], U.S. taxpayers were incensed and Congressional investigations and hearings ensued on April 24, 2013 – ***publicly disclosing for the first time that Fisker had defaulted on its DOE loan in February 2011 by failing to meet the production milestone and that as a result, the DOE had cut off funding to Fisker in June 2011***.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

29.     The Class Period starts on February 28, 2011.  On that day, A123 held an earnings conference with investors to discuss A123's fiscal 2010 financial results and to provide fiscal 2011 and 2012 financial guidance.  During the conference call, Defendant Vieau stated, in pertinent part, as follows:

---

[2]  Fisker received a $529 million grant from the DOE, but had only utilized $193 million of that grant before its funding was halted in May 2011.

Looking into 2012, *we expect to have at least 760-megawatt hours of capacity in place early in the year, which has the potential to support revenue in the range of $450 million to $550 million*. We believe the continued rapid increase in production volumes and revenue will enable us to move to positive gross margins in early 2012 and our increasing scale will provide leverage on operating expenses as well. We currently expect to make *consistent progress towards break-even adjusted EBITDA levels in 2012, achieving that cutover point in early 2013*. From there, we expect our adjusted EBITDA margins will continue to improve to healthy levels along with the rapid growth of our business.

In summary, industry demand is growing rapidly and A123's expanding customer portfolio further validates the large size of this opportunity ahead of us. A123 just won a significant volume production program with a major North American automotive OEM, providing us production agreements with major transportation OEMs in North America, Europe and Asia. We continue to expand our market leadership position in the heavy-duty transportation and electric grid markets, both of which are projected to grow rapidly in the years ahead.

*We expect to see the inflection point in our business start in the second quarter of 2011 and we have visibility into continued strong growth in 2012 and beyond based on the production dates of programs where A123 has already been selected.*

Finally, we've brought our Michigan facilities online and plan to leverage our knowledge gained as we continue to rapidly expand our capacity including another 100% of increase during the next 12 months. *We are executing against plans that we believe will increase our long-term market share in each of our target markets and we believe we are creating a multi-billion dollar company with the ability to deliver attractive profit margins over the long-term.*[3]

30.     The price of A123's stock closed at a Class Period high of $9.48 per share on February 28, 2011.

31.     On March 11, 2011, A123 filed its Form 10-K with the SEC, which was signed and certified under the Sarbanes Oxley Act of 2002 by Defendant Vieau and A123's then-present CFO, John Granara, and stated, in pertinent part, that A123 had "a supply agreement with Fisker pursuant to which [it was] providing Fisker with advanced automotive battery systems *over a multi-year period*" and that A123 then "expect[ed] to rely on [its] supply agreement with Fisker *to represent a significant portion of [its] revenue in future periods*." The Form 10-K also valued the investment

---

[3]     All emphasis in bold and italics is added, unless otherwise noted.

assets on the Company's books, including the Fisker preferred stock, at $21.5 million, and valued its "[l]ong-term grant receivable" at $75.8 million.

32.     On March 28, 2011, A123 announced that it intended to offer, subject to market and other conditions, 18 million shares of common stock and concurrently offer $125 million principal amount of convertible subordinated notes due 2016 in registered underwritten public offerings. A123 also stated that it intended to grant the underwriters a 30-day option to purchase up to an additional 2.7 million shares of common stock, with respect to the stock offering, and up to $18.75 million aggregate principal amount of the convertible notes, with respect to the notes offering, and that the interest rate, conversion rate and other terms of the convertible notes would be determined at pricing.

33.     On April 4, 2011, A123 priced and sold the 18 million shares at $6 each pursuant to a prospectus filed with the SEC that day, along with the $125 million aggregate principal amount of its 3.75% convertible subordinated notes due 2016 (or a total of $143,750,000 aggregate principal amount of convertible notes if the underwriters exercised in full their option to purchase additional convertible notes) pursuant to a separate prospectus filed with the SEC that day.

34.     On April 8, 2011, A123 announced that the underwriters of its previously announced common stock and convertible subordinated notes offerings had exercised options to purchase 2,184,067 additional shares of its common stock and $18.75 million additional principal amount of convertible subordinated notes in respect of those offerings, bringing its total net proceeds up to $253.9 million.

35.     The registration statement issued in connection with the April 2011 offering (the "Registration Statement") failed to disclose the adverse information detailed herein.

36.     On May 9, 2011, A123 issued a press release announcing A123's first quarter 2011 financial results (for the period ended March 31, 2011).  The press release quoted Defendant Vieau stating, in pertinent part, as follows:

> Our first quarter results were in-line with our expectations.  ***Even more importantly, in the first quarter, we commenced volume production of battery systems for Fisker.  The ramping of this program reinforces our expectation for a revenue inflection point beginning in the second quarter.  We continue to expect strong revenue growth throughout the second half of the year as well,*** which is supported by our customers already in production, as well as a number of customer programs that are expected to enter production during the year, including BMW, Daimler, and Navistar.  Additionally, we advanced our relationship with Smith Electric Vehicles by entering into a production and supply agreement, and we anticipate delivering batteries under this program in the second half of this year.
>
> ***The $254 million in funding we raised early in the second quarter further strengthens our ability to continue our rapid capacity expansion plans.***  The second phase of our Michigan build-out is under way, and we are expecting to more than double our current worldwide manufacturing capacity. ***This expansion supports our plans to capture significant market share and drive rapid revenue growth, with the goal of achieving profitability in the years ahead.***

37.     Later in the afternoon on May 9, 2011, A123 held an earnings conference with investors during which Defendant Vieau provided additional positive commentary on the Company's business metrics, including updating the Company's progress on meeting its previously-announced financial guidance, stating, in pertinent part, as follows:

> Looking into 2012 and 2013, ***stated demand from our customers, including the large North American automaker we have discussed before, is expected to require us to more than double our manufacturing capacity again from current levels to 760 megawatt hours***.  As stated previously, we now have better visibility into the extent of the cost of bringing new facilities online and anticipate improving capacity expansion efficiently as a result of our experience.  To allow us to continue this rapid pace of expansion, we raised additional capital at the beginning of the second quarter through a concurrent stock offering and convertible note offering.  Including the exercise of over allotments by our underwriters, we raised a net total of $254 million, which substantially strengthens our balance sheet. ***We believe this funding will be sufficient to meet our capital expenditure and operating cost requirements to the point of breakeven on adjusted EBITDA basis***.  At the same time, we continue to work with the Department of Energy on our proposed $233 million loan.  We have been advised that we are on a shortlist of high priority applicants and we continue to be actively engaged in the process.

\*       \*       \*

*In summary, our first quarter played out as anticipated and we continue to expect the inflection point in our revenue to begin in the second quarter and continue throughout 2011.* We are pleased with *the continued development of market demand across our target markets* and our solidifying A123 as a leader in the electric vehicle market not only in the heavy duty and commercial segment, but also in the passenger vehicle segment as well as in the electric grid market.

38.      On May 10, 2011, A123 filed its Form 10-Q with the SEC, which was signed and certified under the Sarbanes Oxley Act of 2002 by Defendant Vieau and A123's then-present CFO, John Granara, and stated, in pertinent part, that A123 had "a supply agreement with Fisker pursuant to which [it was] providing Fisker with advanced automotive battery systems *over a multi-year period*" and that "[r]evenue from [that] supply agreement . . ., represents, *and is expected to continue to represent, a significant portion of [A123's] revenue*" going forward. The Form 10-Q also valued the investment assets on the Company's books, including the Fisker preferred stock, at $21.5 million, and valued its "[l]ong-term grant receivable" at $75.8 million.

39.      On May 16, 2011, A123 announced that effective May 12, 2011, the A123 Board of Directors had appointed Defendant Prystash to serve as the Company's CFO.

40.      On June 28, 2011, the SEC wrote A123 commenting on the conference call held by A123 on February 28, 2011, and directing, in pertinent part, as follows:

> We note the statements by your CEO during your fourth quarter 2010 earnings call conducted on February 28, 2011 *indicating that total revenue was expected to increase by over 100% sequentially in the second quarter* and that unabsorbed manufacturing expenses were expected to approximately double in the first quarter as compared to fourth quarter levels. *In your future filings, as applicable, please revise your disclosure to describe and where applicable, quantify known trends that you reasonably expect will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. Please refer to Item 303(a)(3)(ii).*

41.      In response to the SEC's June 28, 2011 letter, on July 19, 2011, Defendants, through their attorneys, caused the Company to write the SEC back, in a letter posted publicly on the SEC's

website, stating, in pertinent part, as follows: "The Company acknowledges the Staff's comment and, *in future filings, the Company will, as applicable, describe and quantify known trends that it expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations in accordance with Item 303(a)(3)(ii)."*

42.     On August 4, 2011, A123 issued a press release announcing A123's second quarter 2011 financial results (for the period ended June 30, 2011). For the quarter, the Company reported an increase in revenue and the press release quoted Defendant Vieau stating, in pertinent part, as follows:

> The highlight to the second quarter was a doubling in the number of our transportation programs in production. This marked an important milestone for A123 as we shifted our focus from building capacity to ramping production. *We doubled our revenue from the first quarter, due largely to the fact that we started shipping prismatic modules and packs in volume to Fisker* and Smith Electric Vehicles. *Overall shipments almost tripled from the first quarter, and this scale contributed to an improvement in gross margin*.

> *We continue to anticipate that revenue for the full year will more than double from 2010 as volumes continue to climb in the second half of the year. In conjunction, A123 will be in an increasingly strong position to drive efficiencies in our manufacturing processes and position our company for profitable growth in the years ahead*.

43.     Later in the afternoon on August 4, 2011, A123 held an earnings conference with investors during which they provided additional positive commentary on the Company's then-present business metrics, including Defendant Vieau updating the Company's progress in meeting its previously-provided financial guidance, stating, in pertinent part, as follows:

> We've been sourced on over 20 transportation projects, which, combined with the strength of our grid and commercial sales pipeline *reinforces our belief that we have a path to the billion dollar revenue mark and beyond*.

> With our initial capacity expansion plans in place, we are increasingly focused on cost-efficiencies, margin improvement, and cash management. As you know, we have invested significantly in our expansion over the past few years. The second quarter marked an important transition as our 600,000 square feet facilities in Livonia and Romulus, Michigan reached much more significant production volume.

- 12 -

We increased our staff in Michigan where we now have more than 1,000 employees. We believe this transition is an important milestone in A123's progress towards being a large scale manufacturer. In line with that transition, we've shifted our focus to optimizing our operating efficiency and drive long-term margin improvements. ***We continue to anticipate that our annual manufacturing capacity will be 660 megawatt hours at the end of 2011, up from 350 megawatt hours at the end of last year. We believe this capacity level supports an annualized revenue run rate of $400 million to $450 million. With the developing business pipeline in all of our target markets we now expect to increase our capacity commitment beyond the previously stated 760 megawatt hour level.***

From a timings perspective, we are likely to make that commitment some time in 2012 as we judiciously balance capacity expansion with margin improvement, cash flow management and our desire to capture market share. We believe our experience, customer commitments and capital resources provide us with the foundation to continue to drive rapid cost-effective growth in the years ahead.

In summary, strong execution and customer demand drove doubling of our revenue during the quarter. ***With multiple customers moving into production, we continue to expect our revenue to more than double in 2011. We remain confident that our growth will continue into 2012 and beyond with a strong market demand and a growing customer portfolio across all of our target markets.*** As our production volume scale, we are focused on increasing efficiencies to drive margin improvements that will position us to be a leading profitable player in the market.

44.     On August 5, 2011, A123 filed its Form 10-Q with the SEC, which was signed and certified under the Sarbanes Oxley Act of 2002 by Defendants Vieau and Prystash, and stated, in pertinent part, that A123 had "a supply agreement with Fisker pursuant to which [it was] providing Fisker with advanced automotive battery systems ***over a multi-year period***" and that "[r]evenue from [that] supply agreement . . ., represents, ***and is expected to continue to represent, a significant portion of [A123] revenue***" going forward. The Form 10-Q also valued the investment assets on the Company's books, including the Fisker preferred stock, at $21.5 million, and valued its "[l]ong-term grant receivable" at $75.8 million.

45.     On August 9, 2011, Defendant Prystash presented at the Pacific Crest Global Technology Leadership Forum and provided additional positive commentary about the Company's

then-present business metrics, confirming it was still on track to meet the previously-stated financial

guidance and updating that financial guidance, in pertinent part, as follows:

> We announced earnings last week. The highlights for the earnings were we had over $36 million of revenue which was double the first quarter **which was consistent with the guidance that we gave at the beginning of the year and in May as well** when we announced our first quarter earnings. **Going forward we reconfirmed our revenue guidance for the rest of the year which is $210 to $225 million.** The second quarter really represented **an inflection point in our business where many of our developmental contracts migrated into the production phase.** We shipped a little bit more than 42 megawatt hours of energy which was about triple what we did in the first quarter. **So all in all we were very pleased with the revenue ramp.**

46.     On September 12, 2011, A123 held an analyst and investor day conference. During

the conference, Defendants reaffirmed the previously-provided 2011 revenue guidance of $210

million to $225 million and highlighted the importance of Fisker's continued contribution to A123's

revenue, noting that Fisker was then anticipating ordering 300 units per week in the fourth quarter of

2011.

47.     On October 4, 2011, A123 announced that on September 30, 2011, A123 and Silicon

Valley Bank had entered into a Credit Agreement providing A123 and its subsidiaries with a

revolving loan facility of up to $40 million. The Current Report on Form 8-K that Defendants filed

with the SEC that day stated that the funds were "to be used to refinance the Corporation's prior

outstanding revolving loan facility . . . and for working capital and general corporate purposes."

48.     On November 4, 2011, A123 reported that it was revising its revenue guidance

downward by 22%, misleadingly blaming "an **unexpected** reduction in orders for battery packs from

Fisker." On this news, the price of A123 shares declined from $3.53 to $3.17, or 10%, on heavy

trading volume of 3.4 million shares trading. However, to preclude a complete free-fall in the

Company's stock price, Defendants concealed that, in reality, Fisker had had lost its government

funding in June 2011 and was refusing any further deliveries from A123. Seeking to avoid a wider

selloff, Defendants affirmatively downplayed Fisker's actions, reassuring investors that the Fisker

- 14 -

"reduction" only reflected a "temporary" inventory reduction, and that A123's relationship with Fisker remained "strong."

49.    The price of A123's common stock closed down at $3.17 per share on November 4, 2011 from its close of $3.53 per share on November 3, 2011.

50.    On November 9, 2011, A123 issued a press release announcing its third quarter 2011 financial results (for the period ended September 30, 2011).  The release announced that the Company's sales had increased to $64.3 million, or 145% above its third quarter 2010 sales.  The release also quoted Defendant Vieau stating, in pertinent part, as follows:

> *The ramp in production volumes that began during the second quarter continued into the third quarter*, resulting in record quarterly revenue of $64.3 million and record quarterly shipments of 67.7MWh.  Last week, we revised our 2011 revenue guidance based on a reduction in fourth-quarter orders from Fisker Automotive *as it balances inventory levels from all suppliers for the Karma plug-in hybrid electric vehicle.  We have taken actions to address the near-term challenges associated with this reduction in volume, and remain optimistic about Fisker and our long-term growth across each of our target markets.*

> During the third quarter, we were sourced for production on a new transportation program, made significant progress in our grid business, *and continued to see growing demand for our commercial solutions.*  In addition, we believe the recent expansion of our partnership with IHI Corporation establishes a strong conduit for delivering A123's battery system technology to the Japanese market.  The IHI agreements provide for proceeds of $32.5 million, which will further increases our available resources when combined with our recent $40 million asset-based lending facility that we put in place in September.

> *Looking ahead, we remain confident in our ability to scale A123's business over the next several years based on the growing level of stated demand from our diverse portfolio of customers across each of our target markets.*  We are making progress on our cell-cost reduction strategy, and we expect to reduce our cash burn. *We believe the company will be well-positioned to achieve break-even quarterly gross margins within 2012, followed by break-even adjusted EBITDA in 2013.*

51.    Later in the afternoon on November 9, 2011, A123 held an earnings conference with investors during which it provided additional positive commentary on the Company's then-present

business metrics, with Defendant Vieau updating the Company's progress on meeting its previously-

stated financial guidance, stating, in pertinent part, as follows:

> We expect demand for additional battery packs to remain low through the first quarter of next year, *picking up in the second quarter and increasing over the course of 2012.* Fisker is producing cars. It has received the necessary regulatory approvals and has begun delivery of production vehicles all of which strengthens our belief that Fisker has the potential to drive meaningful volumes.

*     *     *

> *In summary, we continued to make progress against our long-term goals during the quarter.* It is unfortunate that the dramatic increase in our revenue run rate during the second quarter and third quarter will not continue into the fourth quarter as Fisker balances inventory across its overall supplier base. *But we remain on track to deliver substantial revenue growth during the 2011 and continue to be optimistic about our long-term goal. We're encouraged by the strong market demand and growing opportunities in each of our target markets.* In automotive we have significant relationships in place with auto manufacturers in every global marketplace. We're seeing growing market opportunities in Japan and China and we're expanding our lead in the commercial vehicle segment. In the grid market, we continued to win new programs, new regulations have the potential to stimulate market demand and we're seeing meaningful growth and opportunities both in U.S. and international markets that continue to reevaluate their energy needs. In commercial, we have 10 new programs that are moving to production next year and we're seeing a growing number of attractive applications for our products. *The combination of these factors provides us with confidence in our ability to scale A123's top line over a multi-year period with expected leverage from this scale enabling an improved bottom line over the next several years.*

52.     On November 9, 2011, A123 filed its Form 10-Q with the SEC, which was signed

and certified under the Sarbanes Oxley Act of 2002 by Defendants Vieau and Prystash, and stated, in

pertinent part, that A123 had "a supply agreement with Fisker pursuant to which [it was] providing

Fisker with advanced automotive battery systems *over a multi-year period*" and that "[r]evenue from

[that] supply agreement . . ., represents, *and is expected to continue to represent, a significant

portion of [A123] revenue*" going forward. The Form 10-Q also reiterated that "in November 2011,

[A123] announced revised annual revenue guidance for 2011 due to an *unanticipated* reduction in

orders from Fisker *for the fourth quarter,*" while reassuring investors that the Company continued

to "invest in capital expenditures and build [its] manufacturing capacity in anticipation of demand, *including anticipated demand from Fisker under the supply agreement.* . . ." The Form 10-Q valued the investment assets on the Company's books, including the Fisker preferred stock, at $21.5 million, and valued its "[l]ong-term grant receivable" at $75.8 million.

53.     The price of A123 common stock closed down further on this news, closing at $3.09 per share on November 9, 2011 and $2.97 on November 10, 2011.

54.     On January 20, 2012, A123 announced that on January 19, 2012, A123 had "entered into a placement agent agreement with Lazard Capital Markets LLC . . . relating to a registered direct offering by the Company of an aggregate of 12,500,000 units," with "[e]ach Unit consist[ing] of one share of the Company's common stock and one warrant to purchase one share of such common stock at a negotiated purchase price of $2.034 per Unit," and stating that "[t]he Company expect[ed] to raise gross proceeds of approximately $25.4 million from the offering of the Units." The Current Report on Form 8-K that Defendants filed with the SEC that day also provided an earnings guidance update, stating, in pertinent part, as follows:

> *Fourth Quarter 2011 Update*
>
> Although the Company's financial statements for the year ended December 31, 2011 are not yet complete, preliminary indications are that year-end revenue will be approximately $162 million which is lower than the previously disclosed range of $165 to $180 million. This is due primarily to the previously-announced reduction in Fisker's fourth quarter pack demand and the resulting decrease in shipments. *The Company expects Fisker's pack demand to start increasing earlier in the first quarter of 2012 than previously anticipated and will begin to ramp up production shortly.*

55.     Pursuant to a prospectus that Defendants caused A123 to file with the SEC on January 20, 2012, the security units offered for sale on January 19, 2012 were registered with the SEC for resale.

56.     On March 1, 2012, A123 announced preliminary financial results for fourth quarter and fiscal 2011 (for the period ended December 31, 2011), stating revenues were expected to be "a 64% increase" from fourth quarter 2010.  A123 also claimed to "have taken a number of actions to improve [A123's] manufacturing efficiency, including the addition of a new Chief Operating Officer, Ed Kopowski, who [was] leading [A123's] efforts to reduce costs, improve quality, and better utilize assets," *resulting in "early indications of manufacturing yields for prismatic cells produced in Michigan reaching [its] target range.*"  A123 also issued preliminary revenue guidance for 2012, stating revenue would be *"in the range of $230 million to $300 million, representing 67% growth from 2011 at the midpoint*."

57.     On March 8, 2012, A123 issued a press release announcing its financial results for the fourth quarter and full year 2011 financial results (for the period ended December 31, 2011).  The results were consistent with the preliminary results announced on March 1, 2012, with A123 predicting *"strong revenue growth and improv[ed] profitability margins during 2012."*

58.     Also on March 8, 2012, A123 announced that on March 6, 2012, the Company's Silicon Valley Bank line of credit had been modified to, among other things, increase the interest payable on outstanding amounts and decrease the revolving termination date from September 30, 2014 to June 1, 2013.

59.     On March 12, 2012, A123 filed its annual financial report for the fiscal year ended December 31, 2011 on Form 10-K with the SEC, which was signed and certified under the Sarbanes Oxley Act of 2012 by Defendants Vieau and Prystash, and represented that A123 had "a supply agreement with Fisker pursuant to which [it was] providing Fisker with advanced automotive battery systems *over a multi-year period*" and that "[r]evenue from [its] supply agreement with Fisker … represent[ed], and [was then] expected *to continue to represent, a significant portion of [its]*

*revenue*" going forward. The 2011 Form 10-K reiterated that "in November 2011 and again in January, 2012, [A123] announced revised annual revenue guidance for 2011 due to an ***unanticipated*** reduction in orders from Fisker," but reassured investors that the Company continued to "invest in capital expenditures and build [its] manufacturing capacity in anticipation of demand, ***including anticipated demand from Fisker under the supply agreement*. . . .**" The 2011 Form 10-K continued to value the "[l]ong-term grants receivable" at $75.8 million and disclosed for the first time, as to the Company's investment in the Fisker preferred stock, in pertinent part, as follows:

> During the year ended December 31, 2011, we elected not to participate in Fisker's subsequent stock financing. This election not to participate resulted in the conversion of our preferred shares of Fisker to common shares on a 2:1 ratio. As such, ***we performed an analysis and valuation of our investment in Fisker resulting to the recognition of an impairment charge of $11.6 million for the year ended December 31, 2011.***

60.     On April 11, 2012, A123 announced that on April 5, 2012, A123 and the DOE had entered into an amendment to the December 4, 2009 agreement between the Company and the DOE related to the terms and conditions of the $249.1 million grant that was awarded to the Company on August 5, 2009, extending the term of the contract from December 2, 2012 to December 2, 2014. The Current Report on Form 8-K that Defendants filed with the SEC that day also stated that "[t]hrough December 31, 2011, the Company had received $127.0 million from the DOE in reimbursement for costs incurred."

61.     On May 11, 2012, A123 issued a press release announcing its first quarter 2012 financial results (for the period ended March 31, 2012). The release represented that revenue for the first quarter of 2012 was expected to be approximately $10.9 million "below [Defendants'] prior expectations" and "a decrease of 40% from $18.1 million in the first quarter 2011," for a predicted net loss of approximately $125 million. Defendants also adjusted A123's full-year revenue forecast downward, stating that "capacity for prismatic cell production [would] be constrained for the

foreseeable future" and that revenue in 2012 would be in the range of $145 million to $175 million, compared to prior expectations of $230 million to $300 million.

62.     On May 11, 2012, A123 also announced that its revolving credit facility with Silicon Valley Bank had been amended to eliminate the borrowing facility and now provided for only up to $15 million as security for letters of credit.  Any then-outstanding letters of credit would also be required to be cash collateralized at 105% of their face amount.

63.     On this news, the price of A123 common stock closed down from $1.12 per share on May 10, 2012 to close at $1.03 per share on May 11 and $0.91 per share on May 12, 2012.

64.     On May 15, 2012, A123 filed its quarterly financial report on Form 10-Q with the SEC, which was signed and certified under the Sarbanes Oxley Act of 2002 by Defendants Vieau and Prystash, and stated, in pertinent part, that A123 had "a supply agreement with Fisker pursuant to which [it was] providing Fisker with advanced automotive battery systems *over a multi-year period*" and that  "[r]evenue from [that] supply agreement . . . represents, *and is expected to continue to represent, a significant portion of [A123] revenue*" going forward.  The Form 10-Q also reiterated that "in November 2011 and again in January, 2012, [A123] announced revised annual revenue guidance for 2011 due to an *unanticipated* reduction in orders from Fisker," but reassured investors that the Company was continuing to "invest in capital expenditures and build [its] manufacturing capacity in anticipation of demand, *including anticipated demand from Fisker under the supply agreement*. . . ."  The Form 10-Q now valued the Company's investment in Fisker's preferred stock at $8.9 million and its "[l]ong-term grant receivable" at $75.8 million.  A123 also disclosed that "[t]he balance due from Fisker [for purchases] as of December 31, 2011 and March 31, 2012, *of $3.7 million and $0.2 million, respectively, [had been] included within accounts receivable*, net on the condensed consolidated balance sheets."

- 20 -

65.     On May 15, 2012, A123 announced that on May 11, 2012, it had entered into a Securities Purchase Agreement with institutional investors pursuant to which the Company had agreed to sell $50 million aggregate principal amount of unsecured, senior convertible notes and warrants to purchase shares of the Company's common stock equal to 30% of the number of shares underlying the notes assuming conversion at the initial conversion price.

66.     On May 30, 2012, A123 filed a Current Report on Form 8-K with the SEC representing, among other things, that:

> . . .[T]he Company's history and near term forecast of incurring significant net losses and negative operating cash flows, raise substantial doubt on the Company's ability to continue as a going concern. Management is taking actions to raise additional capital to fund cash requirements and evaluating other strategic alternatives. The Company is actively engaged in discussions with strategic partners for substantial investments in the Company. In addition, the Company is evaluating various options to raise cash in the capital markets.

67.     On July 6, 2012, A123 disclosed that on July 5, 2012, with A123 stock trading at $1.30 per share, the Company had entered into a placement agent agreement with Lazard Capital Markets LLC relating to a registered direct offering by the Company of an aggregate of 7,692,308 shares of the Company's common stock and warrants to purchase additional shares of such common stock for an exercise price of $0.001 per share; and that the Company expected to sell the shares at a negotiated purchase price of $1.30, subject to certain adjustments, based upon the exercise of the warrants per share in order to raise gross proceeds of approximately $10 million, based upon the exercise of the warrants from the offering of the shares and warrants. On July 9, 2012, A123 filed a prospectus with the SEC registering those shares and warrants for resale to the public.

68.     On July 9, 2012, A123 also filed a second prospectus registering 250,397,531 shares for resale by other existing A123 shareholders.

69.     On August 9, 2012, A123 filed its quarterly financial report on Form 10-Q with the SEC, which was signed and certified under the Sarbanes Oxley Act of 2002 by Defendants Vieau

and Prystash, and stated, in pertinent part, that the Company had "a supply agreement with Fisker pursuant to which [it was] providing Fisker with advanced automotive battery systems *over a multi-year period*" and that "[r]evenue from [that] supply agreement . . . represents, *and is expected to continue to represent, a significant portion of [A123] revenue*" going forward," and again reiterated that "in November 2011 and again in January 2012, [A123] announced revised annual revenue guidance for 2011 due to an *unanticipated* reduction in orders from Fisker for the fourth quarter" while again reassuring investors that the Company continued to "invest in capital expenditures and build [its] manufacturing capacity in anticipation of demand, *including anticipated demand from Fisker under the supply agreement*. . . ." As to the Fisker preferred stock, the Form 10-Q disclosed that "[d]uring the three months ended June 30, 2012, the Company updated its analysis and valuation of its investment in Fisker resulting in the recognition of an [additional] impairment charge of $2.9 million for the three and six months ended June 30, 2012" and that the "Company's investment in Fisker at June 30, 2012 had a carrying value of $6.0 million." The Form 10-Q now valued the Company's "[l]ong-term grants receivable" at $101+ million and stated that "[t]he balance due from Fisker as of December 31, 2011 and June 30, 2012, of *$3.7 million and $0.2 million, respectively, [was] included within accounts receivable,* net on the condensed consolidated balance sheets."

70.    In August 2012, A123 hired Alvarez Marsal N.A. Company to advise as to restructuring and, most likely, bankruptcy.

71.    On August 16, 2012, A123 announced that it was working on a deal with Wanxiang Group Corp. ("Wanxiang"), China's largest auto-parts maker, for financing in exchange for a majority ownership stake.

72.     By early October 2012, the common stock of A123 was trading for $0.27 per share, down from a 52-week high of $4.44 per share in late 2011 – and a Class Period high of $9.48 per share on February 28, 2011.

73.     The statements referenced above in ¶¶29, 31, 35-38, 40-48, 50-52, 54, 56-61, 64, 66 and 69 were each materially false and misleading when made as Defendants knew or recklessly disregarded the following adverse facts:

        (a)     By February 2011, Fisker was in default on the production milestone in its funding agreement with the DOE, which threatened to terminate both Fisker's DOE funding and Fisker's ability to pay A123 for batteries and/or to fulfill the supply contract;

        (b)     By June 2011, the DOE had cut off further financial disbursements to Fisker, further threatening Fisker's ability to pay A123 for batteries and/or to fulfill the supply contract;

        (c)     By the fall of 2011, Fisker had completely run out of cash and was unwilling to accept any further deliveries of batteries from A123;

        (d)     A123's $20.5 million investment in Fisker's preferred stock was materially impaired, overstating A123's assets and understating its expenses and losses during the Class Period;

        (e)     The carrying value of A123's "[l]ong-term grant receivable" was overstated, overstating A123's assets and understating its expenses and losses during the Class Period;

        (f)     The carrying value of accounts receivable due to A123 from Fisker was overstated during the Class Period; and

        (g)     As a result of the foregoing, the Company was not on track to achieve the financial results Defendants had led the market to expect throughout the Class Period.

74.     On October 16, 2012, A123 filed for bankruptcy protection under Chapter 11, Title 11, United States Code, in the United States Bankruptcy Court for the District of Delaware, stating

that the Wanxiang deal had fallen through and that it would sell its automotive business assets to Johnson Controls Inc.  The filing listed assets of $459.8 million and liabilities of $376 million.  On this news, the price of A123 common stock fell $0.18, or 74%, to $0.06 a share.

75.     On January 28, 2013, Wanxiang America purchased the preponderance of A123's assets out of bankruptcy for $256.6 million and organized A123Systems, LLC.  On March 22, 2013, the Company changed its name from A123 Systems, Inc. to B456 Systems, Inc.

76.     In March 2013, Fisker hired bankruptcy counsel Kirkland & Ellis LLP to prepare for its own potential bankruptcy filing.

77.     On April 5, 2013, Fisker laid off 75% of its employees, retaining only employees to negotiate with potential buyers and the DOE.

78.     In April 2013, Fisker missed its first scheduled payment of $10 million to the DOE and the DOE immediately seized more than $20 million from Fisker's assets on April 11, 2013 to pay down the loan.

79.     On April 24, 2013, the U.S. House of Representatives Committee on Oversight and Government Reform held a hearing to investigate the DOE's lending to Fisker.  The Written Statement of Nicholas Whitcombe disclosed, in pertinent part, as follows:

**Fisker Automotive**

On April 22, 2010, the LPO closed a $529 million loan to Fisker Automotive for the development and production of two lines of plug-in hybrid electric vehicles: the Karma and the Atlantic.  To date, $192 million of the loan has been disbursed to Fisker to fund eligible Karma expenses and to partially fund the purchase of a former General Motors plant in Delaware.  These funds were used, for example, to support engineering for the Karma at Fisker's United States facilities in Anaheim, California to develop tools, equipment, and manufacturing processes.

From the outset, the Department established rigorous benchmarks, keyed to progress on the Karma and Atlantic product lines, as conditions precedent to any disbursements of Fisker's loan.  As has been publicly reported the Department understands that Fisker has recently faced certain financial difficulties, has

terminated a significant portion of its workforce, and has been engaged in a process of seeking additional private investment.

The Department has acted decisively to protect the taxpayers' interest since it became evident that Fisker faced financial difficulties. **In June 2011, the Department ceased making disbursements to Fisker after the company began to fall short of the milestones required in the loan agreement. Since then, the Department has continued to communicate with Fisker as it has sought to revise its business plan and achieve profitability.**

80.   During his own testimony, Henrik Fisker, founder of Fisker, testified that his "company met initial milestones before informing the [DOE] that it would not meet certain future milestones on time," stating "Fisker regularly apprised the [DOE] of the company's progress." Henrik Fisker also told the Committee, in pertinent part, as follows:

### Rough Roads

Fisker Automotive began drawing down on the Karma loan in April 2010. In October 2010, we unveiled the Karma that was to go into production with its advanced powertrain technology. **In 2011, the Karma ran into several significant obstacles.** First, regulatory approvals for the Karma in the United States took longer than anticipated. Since the Karma was built from scratch on a totally new platform with a new powertrain, the EPA and National Highway Transportation Safety Administration required additional time to evaluate, test, and eventually certify it. **That review period and some initial parts supply issues significantly delayed our production schedule and delivery to customers.**

81.   Private documents and communications between Fisker and the DOE, obtained by an entity called PrivCo, were also made public on or about April 24, 2013 and demonstrate, in pertinent part, as follows:

- The April 22, 2010 Fisker and DOE Loan Agreement listed as "Events of Default and Remedies" Fisker's "Failure to Achieve Milestones…by the relevant Milestone Completion Date," including **"Commencement of commercial production of the Karma vehicle" by February 2011**.

- Displaying the following Fisker Karma Loan Draw Schedule, PrivCo concludes that: **"From the dwindling draw amounts, it is apparent that Fisker is failing to meet DoE productions milestones"**:

## Fisker Department of Energy Loan Draw Schedule

| | Karma Loan Amount Drawn | Karma Note Quarterly IR | Nina Loan Amount Drawn | Nina Note Quarterly IR |
|---|---|---|---|---|
| May-10 | $60,029,000 | 2.314% | $0 | |
| Jun-10 | $17,069,000 | 2.088% | $0 | |
| Jul-10 | $16,120,000 | 1.741% | $0 | |
| Aug-10 | $0 | | $16,847,000 | 2.478% |
| Sep-10 | $16,062,000 | 1.291% | $0 | |
| Oct-10 | $0 | | $0 | |
| Nov-10 | $0 | | $0 | |
| Dec-10 | $19,702,000 | 1.801% | $0 | |
| Jan-11 | $17,642,000 | 1.793% | $0 | |
| Feb-11 | $10,038,000 | 1.931% | $0 | |
| Mar-11 | $9,265,000 | 1.786% | $0 | |
| Apr-11 | $3,973,000 | 1.817% | $2,967,000 | 3.239% |
| May-11 | $3,140,800 | 2.922% | $0 | |
| **Total Amount Drawn** | **$172,440,800** | | **$19,814,000** | |

PrivCo

- Though "[i]n a presentation delivered by Fisker to the DOE in March 2011, Fisker claimed that the [February 2011 Karma] launch milestone was met," "[i]n a subsequent presentation in June 2011, Fisker presented new information calling into questions whether the launch milestone had actually been met."

- On April 24, 2013, Nicholas Whitcombe – Supervisory Senior Investment Officer, Loan Programs Office, DOE – testified under oath before the House Oversight Subcommittee that Fisker had in fact failed to meet a production milestone in February 2011.

- In June 2011, the DOE issued a "Drawdown Stop Notice" under the "Consequences of Default" provisions of the Fisker DOE Loan and Credit Agreement:



- Meanwhile, despite being in default on a production milestone since February 2011, Fisker had continued to draw on its loan from the DOE, borrowing a further $29 million after its event of default;

- On October 22, 2012, the House of Representatives Committee on Oversight and Government Reform wrote a letter to the DOE requesting information on Fisker.

- That through documents obtained through the Freedom of Information Act by PrivCo, it was revealed that Fisker sold fewer than 2,200 vehicles in the company's lifetime, a third of which remained on dealers' lots unsold (consumers purchased only 1,600 Fisker vehicles before Fisker ceased production of them in 2012).

82.     On April 24, 2013, the *Wall Street Journal* published an exposé entitled "How the Wheels Came Off for Fisker – Untested Electric-Car Firm Was Ripe for the Times; U.S. Loans Saddled it with Factory Never Used." The *Wall Street Journal* exposé disclosed, in pertinent part, as follows:

> In May 2011, the Obama administration, under pressure from critics of its alternative energy spending and after the high-profile failure of U.S.-backed solar panel maker solar panel makerSolyndra LLC, *froze disbursements to Fisker citing delays in the Karma's rollout.* Nonetheless, Fisker kept ordering parts to build Karmas, piling up costs even as the company struggled to fix software and other problems that prompted complaints from early buyers, and led to critical reviews in auto publications.

> *In the fall of 2011, Fisker's battery supplier, A123 Systems Inc., [] was informed Fisker had run out of cash and wouldn't be able to take more deliveries.*

> A123, which also received a government grant to finance U.S. factories, had shipped about 3,000 battery packs to the company. The Waltham, Mass., company was ready to ramp production to 15,000 packs annually for its top customer. Its own market miscalculations and quality problems led A123 to seek bankruptcy protection last fall.

83.     On June 28, 2013, A123, as B456 Systems, Inc., filed its last quarterly financial report on Form 10-Q with the SEC, listing the value of its "[i]nvestment in Fisker" at "less than $0.1 million" as of September 30, 2012, stating the Company had taken additional impairment charges writing the asset down. The Form 10-Q also stated that the "balance due from Fisker [for purchases] as of December 31, 2011 and September 30, 2012, of $3.7 million and $1.9 million, respectively, [had been] included within accounts receivable, net on the condensed consolidated balance sheets," but when A123 filed bankruptcy, Fisker claimed more than $150 million due to Fisker from A123's

estate. Fisker's claims against A123 were ultimately settled with Fisker receiving $15 million from A123's estate. The Company has since un-registered itself with the SEC and no longer publicly reports its financial status.

84.     The market for A123 common stock and publicly-traded securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, A123 common stock and other publicly-traded securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired A123 common stock and other publicly-traded securities relying upon the integrity of the market price of A123 common stock and other publicly-traded securities and market information relating to A123, and have been damaged thereby.

85.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of A123 common stock and other publicly-traded securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

86.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about A123's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of A123 and its business, prospects, and operations, thus causing the Company's common stock and

other publicly-traded securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing A123 common stock and other publicly-traded securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of A123 common stock and other publicly-traded securities was removed and the price of A123 common stock and other publicly-traded securities declined dramatically, causing losses to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

87.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding A123, their control over, and/or receipt and/or modification of A123's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning A123, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

88.     The "Safe Harbor" warnings accompanying A123's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form

- 29 -

8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

89.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of A123 who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

90.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock and other publicly-traded securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock and other publicly-traded securities; and

(e)     Plaintiff and other members of the Class purchased A123 common stock and other publicly-traded securities between the time Defendants misrepresented or failed to disclose

material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

91.     At all relevant times, the market for A123 common stock and other publicly-traded securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, A123 filed periodic public reports with the SEC; and

(b)     A123 and Defendants regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

92.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of A123 common stock and other publicly-traded securities and operated as a fraud or deceit on Class Period purchasers of A123 common stock and other publicly-traded securities by misrepresenting the value of the Company's business and prospects by overstating its earnings and concealing the significant defects in its internal controls.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of A123 common stock and other publicly-traded securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of A123 common stock and other publicly-traded securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against all Defendants

93.     Plaintiff incorporates ¶¶1-92 by reference.

94.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of A123 common stock and other publicly-traded securities during the Class Period.

96.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for A123 common stock and other publicly-traded securities.  Plaintiff and the Class would not have purchased A123 common stock and other publicly-traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

97.     Plaintiff incorporates ¶¶1-96 by reference.

98.     Defendants acted as controlling persons of A123 within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of A123 common stock and other publicly-traded securities, Defendants had the power and authority to cause A123 to engage in the wrongful conduct complained of herein.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 27, 2013          ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                    SAMUEL H. RUDMAN


                                    _____
                                    SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

HOLZER HOLZER & FISTEL LLC
MICHAEL I. FISTEL, JR.
MARSHALL P. DEES
200 Ashford Center North, Suite 300
Atlanta, Georgia 30338
Telephone:  770/392-0090
770/392-0029 (fax)
mfistel@holzerlaw.com
mdees@holzerlaw.com

Attorneys for Plaintiff

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost |
|---|---|---|---|
| A123 Systems | 8/13/2012 | 5000 | 2796.59 |
| | 8/14/2012 | 25000 | 12620.29 |
| | 8/16/2012 | 65000 | 29792.93 |
| Sales: | 10/16/2012 | 5000 | 696.50 |

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds |
|---|---|---|---|
| A123 Systems | 9/11/2012 | 5000 | 1280.21 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __25t__ day of __Sept__, 2013 in ____Milton____, ____WV____.

City    State

(Signature) X_____Richard A. Dempsey_____

(Print Name)___Richard A. Dempsey_____

2